FEDERATED MUTUAL IMPLEMENT AND HARDWARE COMPANY

*v.*

EDGAR SHOEMAKER.

366 S.W.2d 129.

(*Knoxville,* September Term, 1962.)

Opinion filed February 7, 1963.

On Petition for Rehearing April 3, 1963.

AMBROSE, WILSON & SAULPAW, Knoxville, for petitioner.

PORTER & PORTER, Newport, for respondent.

PER CURIAM.

The plaintiff in error has filed a petition to rehear and has called our attention to some facts which were overlooked and not considered in our original opinion.

It is said in the petition:

"This decision is erroneously based upon the assumption that Edgar Shoemaker had worked for Connie Overholt, off and on, on other occasions, when in fact the date in question was the *only* occasion that Mr. Shoemaker had ever been employed by Mr. Connie Overholt to do any carpenter work on his motor company garage door. Mr. Shoemaker had been requested to do this small repair job approximately a week before he undertook to do so."

Close examination of the testimony of Mr. Shoemaker reveals that his occupation is that of carpenter, and that he had been engaged in this type of work since he was sixteen years of age, and he also does some painting and he also stated that he was a general builder. As a matter of fact he was engaged in building a house for Mr. Overholt at the time he was injured at the Overholt Motor Company.

Mr. Shoemaker was asked:

"Q. You contract for the repair of houses, don't you, and do repair work?

"A. Well, I always just take it by the hour. I never do take any contract work.

"Q. You do it then by the hour, you do not do it by the job?

"A. No.

"Q. You pick up odd carpenter jobs, you might say?

"A. Yes.

"Q. Is that correct?

"A. Yes.

"Q. You work for yourself, don't you?

"A. Yes.

"Q. In other words, you are self employed, is that correct?

"A. Well, something on that line.

"Q. You don't have any bosses other than yourself?

"A. No, just myself and the one I am working for, whoever it might be.

"Q. You do not work for anyone in particular?

"A. No.

"Q. You haven't held a salaried job in many years, have you,

"A. No, I have not worked for any contractors for several years."

Mr. Shoemaker also said that he purchased building supplies from Overholt Hardware Company, which adjoined Overholt garage. There are two outside entrances to the garage and there is a connecting door between the Hardware Company and the garage. In the entrance to the garage are overhead sliding doors.

Mr. Shoemaker built a truck bed for Overholt Hardware Company. However, the work was performed in the Overholt garage. He did not deal with nor negotiate with Connie Overholt, who managed Overholt Motors, in so far as building or repairing the body or bed on the truck. In that transaction he was working for Clay Overholt, who ran the Hardware Store. Sometime prior to the work on the truck bed Connie Overholt asked Shoemaker to repair the two sliding doors which are referred to above. It was in the repair of one of these sliding doors that Mr. Shoemaker fell and injured himself, for which injury he brought suit under the Workmen's Compensation Law.

Earl Lane, an employee of Overholt Hardware Company, assisted Mr. Shoemaker when he, Lane, had nothing else to do. He assisted in the repair of the garage door.

Mr. Shoemaker was asked whether or not he recalled ever having worked on the garage building before October 21, 1960, the date of his injury. He replied that he had done some carpenter work on the garage building for Mr. Overholt sometime prior thereto.

Mr. Shoemaker was doing carpentry work, his regular occupation, at the time of his injury.

Mr. Connie Overholt testified that Mr. Shoemaker was a good carpenter, and that on October 21, 1960, he was in the act of repairing the garage door when he fell from the ladder and was injured. He was being paid at the rate of $1.50 per hour.

He further said that he operated the Overholt Motors and that the type of work carried on at the garage was "just general repair, automobile repair, glass repair," and that he was not engaged in the carpentry business and that he did not recall ever employing any carpenter prior to this date to do any work in or around Overholt Motors.

"Q. How often did you employ carpenters there in the operation of your garage?

"A. I don't recall ever employing any before. Usually the boys there in the shop did it.

"Q. This was the only occasion then?

"A. Yes.

"Q. On October 21, 1960?

"A. That is the only one I recall.

"Q. How long have you known Mr. Shoemaker?

"A. Oh, 10 or 12 years, I guess.

"Q. Do you know what kind of business he was engaged in?

"A. Yes, sir.

"Q. What kind?

"A. Carpenter.

"Q. Is he a mechanic?

"A. No, I don't think so.

"Q. How did you obtain his services to repair that door?

"A. Well, he was doing some work for the hardware store on a truck bed, and I had noticed the doors had some rotten boards up over them, and I asked Ed if he could repair them when he got through there, and he said he could after he got through at Overholt's. I didn't know he was working that day. I imagine that was a week before."

No agreement was reached about the exact amount of compensation to be paid Mr. Shoemaker for his work for doing work on his home, and in regard to the amount but Overholt knew what Mr. Shoemaker had charged him to be charged for this particular work he was asked this:

"Q. He was to submit a bill?

"A. Yes.

"Q. Whatever he was going to charge and you would pay it?

"A. Yes.

"Q. Pay it out of the garage funds?

"A. Yes.

"Q. Was the work which Mr. Shoemaker was doing aside from and independent from your usual trade or business or profession or occupation?

"A. Yes.

"Q. Was Mr. Shoemaker regularly employed by you in the operation of your garage there?

"A. No.

"Q. Did you tell him how to do this particular work?

"A. I think I pointed out these rotten boards. I believe that is about all I told him. Of course, the door wasn't working too good. I don't think I mentioned that to him.

"Q. Did you tell him how to do the work?

"A. No, I didn't.

"Q. Did you tell him when to start?

"A. No.

"Q. Did you know when he went to work on the door?

"A. No. I don't know until after this happened.

"Q. Were you or was anybody of your garage employees or mechanics supervising this work?

"A. Not that I know of. I don't know that they knew about it. Of course, they would have to know that he was there.

"Q. Did you have any control over his work?

"A. No.

"Q. Was Mr. Shoemaker to continue working for you after he finished repairing the garage doors?

"A. No.

"Q. This was a one-job proposition?

"A. That is right."

The only witnesses testifying as to the pertinent facts of the case on behalf of petitioner were Edgar Shoemaker and his employer, Connie Overholt, and the testimony of these witnesses material to the disposition of this petition to rehear has been quoted, and their entire testimony has been carefully reviewed again by this Court.

We observe that Overholt Motors was engaged in the business of operating a garage for the general repair of automobiles, and the doing of carpentry work was not a part of the business of Overholt Motors.

It is true that the lessee of the building Overholt Motors was obligated to keep the building in reasonable and proper repair, but, of course, the obligation to do this was not a part of the operation of the business of Overholt Motors, although it might be considered incidental thereto, and if performed by regular employees of Overholt Motors resulting in injuries, such employee might be permitted to recover for injuries sustained while making such repairs.

However, in the case before us Mr. Shoemaker was not an employee of Overholt Motors within the meaning of the Act for several reasons. One is that he is a carpenter by trade and occupation and has been so engaged since he was sixteen years of age. He charged a fixed sum, usually, $1.50 per hour for his services. He says that he was going to charge Mr. Overholt at this rate on this particular job. Mr. Overholt did not know the rate to be

charged him but he did expect to receive a bill from Mr. Shoemaker.

This was the only occasion that Mr. Shoemaker had ever been employed by Overholt Motors to do any carpentry work on the garage door. It is true that he had been doing some work for the Hardware Company, which was operated by a brother of Mr. Overholt and Mr. Connie Overholt possibly had an interest therein.

Earl Lane, who assisted Mr. Shoemaker in the repair of the garage door, was an employee of Overholt Hardware Company.

T.C.A. Section 50-906(b) provides:

"The Workmen's Compensation Law shall not apply to:

"(b) Any person whose employment at the time of injury is casual, that is, one who is not employed in the usual course of trade, business, profession, or occupation of the employer."

In the case of *Dancy v. Abraham Bros. Packing Co. et al.*, 171 Tenn. 311, 102 S.W.2d 526, this Court held that the test was not whether the workman was engaged in the usual course of workman's trade or occupation, but the test was, under our Act, whether or not the workman was employed when injured in the usual course of trade, business, profession, or occupation of the employer. This same test was approved by this Court in the case of *Gibbons v. Roller Estate, Inc.*, 163 Tenn. 373, 43 S.W.2d 198, and therein this Court cited the case of *Murphy v. Gaylord*, 160 Tenn. 660, 28 S.W.2d 348. In the Dancy case, supra, this Court said, pages 313-314 of 171 Tenn., page 526 of 102 S.W.2d, as follows:

"Now these facts, as will be seen, relate mainly to the trade or occupation of the employee, which was that of carpenter. It may be conceded that they show that he was engaged 'in the usual course' of his trade or occupation. But this is not determinative. Under our act, Code, sec. 6856(b), the test is whether or not the workman was employed when injured 'in the usual course of trade, business, profession, or occupation of the employer.'

"Can the carpenter work of repairing these doors, windows, salt or coal bins, or inclosures of the control valves of the sprinkler system, be said to have been in the usual course of this employer's trade, business, or occupation? Was not this work rather of an occasional, now and then, exigency, unusual nature? The 'occupaation' of the packing company was not carpentering, constructing, or repairing.

"[2] It does not appear that this packing company maintained a force of carpenters for such work, or was prepared by or through its regular employees to perform it. The company did not maintain any mechanical department for the purpose of performing repair or construction work in connection with the operation of its plant. But, when and as the need arose, from time to time, acting through its chief engineer, a workman was called in for such purposes. The odd carpenter job or jobs the occasion appeared to demand being accomplished, the workman called in to perform this work would be released."

We also believe upon reconsideration that the case of *Harper v. Grady Counce & Son*, 194 Tenn. 279, 250 S.W.

2d 371, written by the late Chief Justice Prewitt is controlling.

In that case a plumber was called in to perform plumbing work at an automobile garage and fell from a ladder while in the process of installing a water pipe.

At page 281 of the opinion in 194 Tenn., at page 371 of 250 S.W.2d the Court said:

"The plumbing business was not part of the business of the defendants or even incidental thereto. The hiring of plaintiff as a plumber to install the water pipe at the place of business of the defendants made him a casual employee only." Citing cases.

It is now obvious to us that Mr. Shoemaker was really engaged as an independent contractor in carrying on his occupation of carpentry. He was following his occupation in carrying out his duties with Overholt Motors and in our opinion was an independent contractor. But if he be considered an employee within the meaning of the Act he could be no more than a casual employee as that term is defined hereinabove and therefore is not covered by the Act.

To permit one to recover for injuries sustained while engaged in industry he is required under the Act to prove:

1. That he is an employee: 2. That he sustained an accidental injury, and 3, that such accident and injury grew out of and in the course of his regular employment.

Although, we are bound by the findings of the trial judge when supported by any material evidence, we are not bound to follow the law as interpreted by the trial court.

In this case we think the trial judge erroneously construed the Workmen's Compensation law in permitting a recovery by the petitioner in this case. It then becomes our duty to reverse his action.

In the case of *Wilson v. Van Buren County,* 196 Tenn. 487, 488, at page 495, 268 S.W.2d 363, at page 366, the Court held:

"While this Court has always considered itself to be bound by the findings of the trial judge on questions of fact when supported by any material evidence, it has not considered itself to be bound by the conclusions drawn by the trial court from undisputed facts. Therefore, it has always reserved unto itself the prerogative of reaching a different legal conclusion from that of the trial court on the same findings of fact. *King v. Buckeye Cotton Oil Co.,* 155 Tenn. 491, 296 S.W. 3, 53 A.L.R. 1086."

The petition to rehear is, therefore, granted. The prior opinion of this Court in this case is withdrawn and this opinion is substituted therefor. An order will be entered reversing and dismissing this case at the cost of the defendant in error.